IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

| | |
|---|---|
| **DISABILITY RIGHTS MISSISSIPPI** | **PLAINTIFF** |
| v. | CIVIL ACTION NO. 1:25-CV-45-GHD-RP |
| **LOUISVILLE MUNICIPAL SCHOOL DISTRICT** | **DEFENDANT** |

**PLAINTIFF'S REPLY IN SUPPORT OF DISABILITY RIGHTS MISSISSIPPI MOTION FOR PRELIMINARY INJUNCTION**

**NOW COMES PLAINTIFF,** Disability Rights Mississippi, by counsel, and files this its Reply in Support of its Motion for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, and now shows unto the Court as follows.

### I. PREMISE

Plaintiff, DISABILITY RIGHTS MISSISSIPPI ("DRMS"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, seeks a preliminary injunction to prohibit Defendant, LOUISVILLE MUNICIPAL SCHOOL DISTRICT ("the District") from continued violation of federal and state laws stemming from their refusal to recognize and cooperate with the investigatory access authority of DRMS, the protection and advocacy agency ("P&A") for the state of Mississippi. DRMS requests that this Court enter a preliminary injunction to allow it to fulfill its mandate as the P&A for people with disabilities in Mississippi.

DRMS is the congressionally designated P&A for individuals with disabilities in the State of Mississippi. DRMS seeks a preliminary injunction against the District to prevent ongoing violations of federal and state law arising from the District's refusal to cooperate with DRMS's investigatory access. DRMS has received credible allegations of abuse and neglect of a student with disabilities at one of the District's schools. Under federal law, DRMS is mandated to investigate such allegations and advocate

1

on behalf of individuals with disabilities, yet the District continues to withhold key records and deny the access necessary for DRMS to fulfill its statutory obligations. Immediate access to the requested records and to relevant individuals involved in the matter is essential for DRMS to investigate suspected abuse or neglect effectively. The ongoing denial of access obstructs DRMS's ability to protect the health, safety, and rights of individuals with disabilities, in direct contravention of the P&A Acts.

Disability Rights Mississippi has met its burden and obligations in showing that a preliminary injunction is essential and necessary in this case. DRMS has shown a substantial likelihood of success on the merits of the case. DRMS has plausibly pled an imminent and irreparable injury. And finally, the threat of harm to DRMS is substantially outweighed by the District's simple failure to comply. For the above indicated reasons, DRMS's motion for Preliminary Injunction should be granted.

## II. REPLY

The District's opposition fails to negate DRMS's entitlement to a preliminary injunction and rests on a flawed interpretation of the PADD Act. The District concedes that DRMS has established probable cause, that public schools fall within the scope of the Act, and that no confidentiality or privilege bars access—yet still claims DRMS's access requests "far exceed" statutory authority. That assertion contradicts the plain language of the PADD Act and the weight of judicial precedent, which consistently affirms that P&As are entitled to broad access to records, individuals, and facilities when investigating probable abuse or neglect. The District's reliance on *Loper Bright* to sidestep these obligations is misplaced; *Loper Bright* did not alter the PADD Act's unambiguous mandate, nor did it disturb decades of case law confirming that agency deference is unnecessary when the statute itself provides clear access rights. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). DRMS's authority flows directly from the Act, not solely from regulation, and the District's obstruction undermines both the law and the federal mandate to protect individuals with developmental

2

disabilities. Therefore, DRMS is entitled to a preliminary injunction.

### A. LOPER BRIGHT REINFORCES DRMS'S STATUTORY ACCESS AUTHORITY UNDER THE PADD ACT.

DRMS's statutory access authority under the PADD Act remains valid and enforceable irrespective of *Loper Bright*, and the District's effort to sideline decades of precedent affirming broad P&A authority is legally and factually flawed. *Loper Bright*, 144 S. Ct. at 2273. To be clear, *Loper Bright* did not eliminate agency regulations or invalidate all judicial decisions that relied on them. It simply instructs courts to interpret statutes based on their text, which DRMS has consistently done in its analysis of the PADD Act. *Loper Bright's* holding does not diminish the scope of DRMS's access authority under the Protection and Advocacy for Individuals with Developmental Disabilities (PADD) Act, 42 U.S.C. § 15043. The plain language of the PADD Act—independent of its regulations—expressly grants P&As the authority to access records and facilities when there is probable cause to suspect abuse or neglect. Courts across the country, applying that plain language, have upheld this broad authority even without *Chevron* deference. *Chevron U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

*Loper Bright* holds that courts must independently interpret statutes without automatic deference to agencies. *Loper Bright*, 144 at 2263. The Court in *Loper* further held, "[a]nd when the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in '"reasoned decisionmaking"' within those boundaries." *Id.* at 2263. The DD Act delegated rule making powers: "Not later than 180 days after October 30, 2000, the Secretary shall develop and publish in the Federal Register for public comment proposed indicators of progress for monitoring how entities described in paragraph (1) have addressed the areas of emphasis described in paragraph (2) in a

3

manner that is responsive to the purpose of this subchapter and consistent with the policy described in section 15001(c) of this title." 42 U.S.C. § 15004(a)(3)(B).

Moreover, DRMS relies on the statutory text of all P&A statutes, its legislative histories, and any binding precedent. The District's attempt to isolate PADD from PAIMI or other P&A statutes also fails, as courts routinely interpret them in harmony due to their similar structures, shared legislative purpose, and common implementing framework. *State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 653-656 (D. Conn. 2005), aff'd sub nom. *Conn. Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229 (2d Cir. 2006). Each of the three federal P&A statutes provides state protection and advocacy systems with broad investigation and monitoring authority, including access to certain records. *See* 42 U.S.C. §§ 15043(a)(2)(H)-(I); 10805(a); 29 U.S.C. § 794e(f)(2). DRMS's request falls squarely within the scope of the authority; Congress intended broad, proactive access to ensure the protection of individuals with developmental disabilities. *Loper Bright* only reinforces the primacy of that clear statutory mandate.

1. ***The Plain Language of the PADD Act Directly Supports DRMS's Record and Access Authority.***

The plain language of the Protection and Advocacy for Individuals with Developmental Disabilities (PADD) Act in fact expressly grants DRMS the authority to access facilities and records when there is probable cause to believe that individuals with developmental disabilities have been subject to abuse or neglect. *Id.* at (a)(2)(I)–(J). The statute clearly states - that the P&A "has the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." *Id.* at (a)(2)(B). To be clear, Congress provided this authority without ambiguity, recognizing the essential role that P&A systems play in protecting the rights of vulnerable individuals. The statute further makes abundantly clear that access includes "immediate" access to "all" records of such individuals, even without guardian consent, when probable cause exists, or in cases of death, serious

4

injury, or suspected abuse. *Id.* at (a)(2)(I).

There are a long line of cases with courts conducting statutory interpretation of the text and finding that the P&A System has broad access which includes: access to records, access to facilities, access to investigate incidents of abuse and neglect, and access to monitor.

Indeed, the plain language of the statute is unambiguous, yet supportive of DRMS's right to have access to any and all records relating to a suspected incident of abuse or neglect. The Fifth Circuit noted in *Van Loon v. U.S. Dep't of the Treasury* that courts must "determine the 'best' reading of a statute; a merely 'permissible' reading is not enough." *Van Loon v. U.S. Dep't of the Treasury*, 122 F.4th 549, 563 (5th Cir. 2024). The District's erroneous interpretation, which seeks to narrow such statutory mandate, not only disregards the PADD Act's plain language, but also undermines the PADD Act's protective purpose issued directly by Congress.

Prior to the enactment of the regulations mandated by Congress in the original DD Act, the Fifth Circuit upheld the district court's statutory interpretation in *Miss. Prot. & Advocacy Sys., Inc. v. Cotten*: that the DD Act expressly authorized persons with disabilities in Boswell the right to "an effective protection and advocacy system." *Miss. Prot. & Advocacy Sys., Inc. v. Cotten*, 1989 WL 224953 at *9, *10 (S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991). This system "has the authority to provide them with certain information and services, to pursue remedies on their behalf, and to investigate alleged incidents of abuse or neglect…" which necessitated "reasonable and frequent access to all residents" and "out of the presence of Boswell staff." *Id.* Boswell officials had tried to limit the P&A staff through their visitation policies and prevent them from meaningful and unaccompanied access to the residents. The court ordered Boswell officials to create a policy that provided the residents with meaningful information about their rights and the services available to them and ordered that MP&A will have "reasonable and prompt access to the Boswell facility and to

5

all potential witnesses of abuse or neglect." *Id.*[1]

Likewise, the plain language interpretation of PADD act delineates the rights of the P&A system to "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual, in order to carry out the purpose of this part." 42 U.S.C. § 15043(a)(2)(H). The District's argument that access must be "reasonable" and to an "individual" with the intent to limit the P&A's access to monitor, investigate, and have access to "individuals" both with disabilities and those who have potential information related to incidents of abuse and neglect is misplaced. The court in *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educat.* analyzed many of the Defense's arguments and found them unpersuasive. *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educat.*, 464 F.3d 229 (2d. Cir. 2006).

In *Hartford*, the Academy was a public school that provided "therapeutic education program for children who are seriously emotionally disturbed and who present challenging behavioral problems." *Id.* at 233. The Connecticut P&A sued seeking a declaration and injunction that it was entitled to observe and interview students in order to investigate complaints of abuse and neglect and to obtain the relevant contact information for all students and parents. *Id.* at 234-235. The Court conducted a separate analysis under PAIMI, PAIR and PADD. Under PADD, the Court found 42 U.S.C. § 15043(a)(2)(b) "provides P&A systems access to facilities and permits them to speak with individuals in order to investigate specific incidents of suspected abuse and neglect." *Id.* at 240-241. Where section 15043(a)(2)(H) "provides more generalized access to any individual with a disability in a location that provides services in order to carry out the statutory purpose of protecting the rights of

---

[1] *See also Robbins v. Budke*, 739 F. Supp. 1479, 1489 (D.N.M. 1990)(District Court conducted its statutory analysis prior to PAIMI regulations creation and determined that under PAIMI, the P&A had the right to unescorted and unannounced monitoring visits of psychiatric medical center. Further held that the P&A had access to records which included the right to interview employee and patient witnesses). *Id.* at 1489.

such persons." *Id., See* 42 U.S.C. § 15043(a)(2)(B), (H). The Court comes to this conclusion by stating that to read both subsections together instead of separately would render Section 15043(a)(2)(H) meaningless and would create redundancy. "We decline to read the statute in a way that would create a redundancy. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is ... a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (citation and internal quotation marks omitted))." *Id.* at 241. Furthermore, the District's interpretation of "reasonable access" to limit the P&A's physical access in its response brief is erroneous.[2] As discussed in *Hartford*, Section 15043(a)(2)(H) states, "have access at reasonable times to any individual"–the qualifier of "reasonable" is in front of "times", thus, based on statutory interpretation, access to a facility for the purposes of the statute should be during "reasonable times", such as normal school or operating hours. *See* 42 U.S.C. § 15043(a)(2)(H) and *Conn. Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.* at 241-242.[3]

The District also argues that the P&A's request for records is too broad and that the language of the PADD Act does not allow for records such as video surveillance, personnel files, or policy manuals. They direct the court to specific language in the statute such as the use of "includes" in Section 15043(c) to narrow the scope of records and the use of the word "individual" in Section 15043(a)(2)(I)(i).[4] The District further uses a modern dictionary definition of the word record to limit Section 15043(c) and exclude the right to access "(1) Joseph Vowell's personnel files; (2) video surveillance of any interaction between J.E. and staff for an entire week; or (3) policy and procedure manuals for Nanih Waiya Attendance Center…".[5] First, The statute clearly defines record to include: (1) a **report prepared or received by any staff** at any **location at which services, supports, or**

---

[2] **[Doc. 27]** at 13.
[3] The Court cites to both the PAIMI regulations and a string of cases finding that the P&A has access during reasonable times to persons with disabilities under the P&A Acts. *See Id.* at 241-242.
[4] *See* **[Doc. 27]** at pgs. 11-12.
[5] **[Doc. 27]** at pgs. 11-12.

7

**other assistance** is provided to **individuals with developmental disabilities**; (2) a **report prepared by an agency or staff person** charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents; and (3) a discharge planning record. 42 U.S.C. § 15043 (c). Section 15043(c)(1)-(2) is quite clear and expressly authorizes access to reports "prepared or received by any staff" and "prepared by an agency or staff person" which would include personnel files prepared by an agency or staff person and policy and procedure manuals for Nanih Waiya Attendance Center which would necessarily detail the proper policies and procedures around incidents of abuse and neglect and steps taken after the alleged incidents.

In *Disability Rights Tex. v. Bishop*, the court analyzed the particular use of those words in the PAIMI statute using standard meaning at the time the P&A Acts were created.[6] In *Bishop*, the P&A requested security-camera footage related to allegations of abuse of a person with mental illness being inappropriately placed in restraints while in custody of Taylor County Detention Center. *Id.* at 458. Bishop, the defendant, argued that the term record in the PAIMI Act did not include video footage that was not created for medical care or treatment. *Id.* at 460. Bishop further argued that the term record only includes what is found in Section 10806(b)(3)(A).[7] *Id.* at 462. The court found that, "the word 'includes' is 'non-limiting' and indicates that the definition is "non-exclusive"". *Id.* citing *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 528 (5th Cir. 2005)[8]. The court used the definition of

---

[6] *Disability Rights Tex. v. Bishop*, 615 F. Supp. 3d 454 (N.D. Tex. 2022).
[7] As used in this section, the term "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records. 42 U.S.C. § 10806(b)(3)(A)
[8] The court in Bishop further analyzed the use of include in several sections of the PAIMI statute: Variations of the word "include" appear in other definitions in PAIMI, and their respective contexts make clear that the definition is not limited to the series of terms that follows. *See, e.g.*, §§ 10802(1) (defining "abuse" to "include[ ] acts such as ... the use of bodily or chemical restraints" among other things), 10802(3) (" 'facilities' may include, but need not be limited to ..."), 10802(5) (defining "neglect" to "include[ ] an act or omission such as ..."). Thus, Section 10806(b)(3)(A) provides a non-exhaustive list of examples that are subsumed within "records" and does

"include" from "Garner's Dictionary of Legal Usage 439–40 (3d ed. 2011) (explaining that "the word 'including' itself means that the list is merely exemplary and not exhaustive")". *Id.* While the word "include"[ ] does not appear in the PADD Act as numerously for context as the PAIMI Act, the word "include" does not preclude other types of records that allow the P&A to fulfill its statutory mandate. The court found that Congress used the word "includes" to provide a "non-exhaustive list of items covered by the general term 'records'." *Id.* at 463.[9] The court further found that the definition of record in Webster's Third International Dictionary, Unabridged (1981) around the time of enactment of the P&A statutes clearly included video as a type of record. "While videos are not mentioned in the noun definition of "record," the verb definition states "to cause (sound, visual images) to be transferred to and registered on something (as a phonograph, disc, magnetic tape) by mechanical usu[ally] electronic means." [court citing Webster's]. So the original public meaning of "record" at the time of enactment is broad and encompasses video and audio recordings.'" *Id.* at 464.

The court further analyzed the use of the phrase individual and found that "of…any individual" did not need a narrow reading and the preposition may be used to show connection or association as well as ownership. *Id.* at 465 (citing *Pa. Prot. & Advoc., Inc. v. Houstoun*, 228 F.3d 423, 427 (3d Cir. 2000)) (Alito, J.) (citing Random House Dictionary of the English Language 999 (1967)) (construing "records" in Section 10805(a)(4) to include peer-review reports belonging to a hospital rather than an individual patient).[10] The court found the statutory text and cases interpreting Section

---

not address whether "records" includes videos. *Disability Rights Tex. v. Bishop*, 615 F. Supp. 3d 454, 462 (N.D. Tex. 2022).

[9] *See also*, the court's analysis of the statutory interpretation of includes at 463 "Numerous courts have found that phrases like "including, but not limited to" express a contrary congressional intent, indicating that a definition of a general term is non-exhaustive and should not be constrained based on the specific terms listed in the definition. *See, e.g.*, *id.* ("Thus, since the phrase 'including, but not limited to' plainly expresses a contrary intent, the doctrine of ejusdem generis is inapplicable.") (citations and emphasis omitted); *United States v. Migi*, 329 F.3d 1085, 1088 (9th Cir. 2003) ("[W]e need not apply ejusdem generis because Congress modified its list of examples with the phrase 'including, but not limited to.' That phrase mitigates the sometimes unfortunate results of rigid application of the ejusdem generis rule.") (cleaned up); *United States v. West*, 671 F.3d 1195, 1198–99 (10th Cir. 2012) (same).'"

[10] *See* the court's review of cases interpreting "of…any individual," at 464-465.

10805(a)(4) persuasive and held that neither the phrase "of any individual" nor "record" was limited to those produced as part of the care, treatment, or investigation into abuse or neglect of an individual. *Id.*[11] The P&A is entitled to records of video surveillance between J.E. and staff for the week of the alleged abuse and neglect.[12] Records should not be so narrowly read as to exclude necessary documents to investigate abuse and neglect such as policy and procedure manuals of the facility providing services to J.E., nor should it exclude the personnel file which should have reports and documentation related to the incidents, and it most certainly should not exclude video footage that will allow the P&A to potentially see the alleged abuse and neglect occur.

The P&A Acts are broadly interpreted to allow the system to fulfill its mandates: to protect and advocate, to monitor, and to investigate instances of abuse and neglect. Statutory interpretation using the common definitions at the time of enactment clearly shows that the word record is broad and should be understood to encapsulate evidence and information the P&A will need to fully investigate both "abuse" and "neglect". To substantiate abuse and determine if the District was neglectful, the P&A is entitled to records that can show the duties of the District, their policies and procedure manual, and personnel files of Joseph Vowell, which should contain information related to abuse and neglect or records of the District's finding of potential improper conduct.[13] The PADD act is clear and provides express authority for broad access to records, facilities, and [individuals] to ensure the mandates are fulfilled. *Conn. Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 241–42 (2d Cir. 2006) quoting *Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.,* 97 F.3d 492, 497 (11th Cir. 1996).

---

[11] Only after the court analyzed the text of the statute and the ordinary meaning of the "records" and conducted a statutory interpretation of the phrase"of an individual", did the court conduct an analysis of the PAIMI regulations under the *Chevron* framework regarding the inclusion of videos in the regulations and found it to be a permissible interpretation of the term record. *Id.* 468-469.

[12] The Fifth Circuit also affirmed another decision by a district court in Texas that found that Disability Rights Texas was entitled to video footage pertaining to the involuntary commitment of its client. *Disability Rights Tex. v. Hollis*, 103 F.4th 1058 (5th Cir. 2024). The Fifth Circuit conducted a statutory analysis of the term "records" and "of…any individual" and affirmed the lower court's holding that the video footage pertaining to the involuntary confinement must be disclosed. *Id.* at 1063-1067.

[13] *See Disability Rights Tex. v. Bishop*, "[i]f "records" are limited to those written records produced as part of the care, treatment, or investigation into the **abuse of a particular P&A client**, as Bishop suggests, the inclusion of nonfeasance in the definitions of "abuse," "neglect," and "records" would be rendered surplusage. Congress's grant of records-access authority, specifically to investigate nonfeasance, would be vitiated. And P&A organizations would not be authorized to obtain records of nonfeasance that they are congressionally charged to investigate and substantiate.'" 615 F. Supp. 3d 454, 466-467 (N.D. Tex. 2022).

***DRMS's Statutory Regulations are wholly consistent with the PADD Act Statute.***

The regulations implementing the PADD Act, including 45 C.F.R. §§ 1326.25 and 1326.27, align seamlessly with the statute's text and purpose. Again, these regulations do not expand DRMS's authority beyond what Congress explicitly provided; rather, they clarify and operationalize the P&A system's ability to fulfill its statutory duties. The regulations ensure consistency in how P&A systems execute their mandates across jurisdictions and provide guidance on practical aspects such as timelines for access and scope of records. Far from conflicting with the statute, the regulations are faithful to the broad investigative authority that Congress intended to ensure timely and unimpeded protection of individuals with developmental disabilities. Even under *Loper Bright*, where courts are directed not to defer to agencies absent ambiguity, these regulations still serve as persuasive evidence of Congress's intent and are consistent with the unambiguous language of the statute.

The District's argument misconstrues both the scope of DRMS's statutory authority under the PADD Act and the role of agency regulations in interpreting that authority. Contrary to the District's assertion, the regulations do not expand DRMS's statutory authority, but rather clarify the practical execution of that authority in alignment with the plain language and purpose of the PADD Act. "The P&A Statutes charge P&A systems to be responsible for 'monitoring compliance with respect to the rights and safety of individuals with developmental disabilities.' 45 C.F.R. § 1386(c)(2)(ii)[14]; *see also* 42 C.F.R. § 51.42(c)(2)." *Disability Rights N.Y. v. N. Colonie Bd. of Educ., No. 1:14-CV-0744, 2016 WL 1122055, at *8 (N.D.N.Y. Mar. 21, 2016).* These regulations reflect the Congressional intent to empower the P&A to conduct effective investigations—specifically, to ensure immediate, unaccompanied access to individuals with developmental disabilities and the places where they receive

---

[14] Redesignated as 45 C.F.R.§§ 1326.25 to 1326.28 by 81 FR 35645. Current citation is 45 C.F.R. § 1326.27(c)(2)(ii).

services, especially when probable cause of abuse or neglect exists. *See* 42 U.S.C. § 15043(a)(2)(H)–(J), *see also Miss. Prot. & Advocacy Sys., Inc. v. Cotten*, 1989 WL 224953 at *9, *10 (S.D. Miss. Aug. 7, 1989), aff'd, 929 F.2d 1054 (5th Cir. 1991).

The District's argument that the *Buckeye Ranch*[15] decision is irrelevant because it pertains to PAIMI is unavailing. Again, as earlier stated, Courts have routinely interpreted PADD and PAIMI and other federal P&A statutes together due to their shared legislative history, nearly identical access provisions, and common implementing regulations. *Hartford Bd. of Educ.*, 355 F. Supp. 2d at 653-654 (D. Conn. 2005). Moreover, *Buckeye Ranch* remains instructive even post-*Loper Bright*; its decision reinforces—not undermines—the alignment between agency regulations and the underlying statute. The District's suggestion that *Loper Bright* nullifies decades of consistent judicial interpretation and the regulatory framework that Congress has authorized is mistaken. Again, *Loper Bright* simply holds that courts must determine the best reading of the statute without automatic deference, and also instructs courts to recognize constitutional delegations of discretionary authority to an agency when determining the best reading of a statute. *Loper Bright*, 144 S. Ct. at 2263, 2273. Here, that best reading is entirely consistent with DRMS's longstanding access and authority granted by Congress to carry out its federal mandate.[16]

Finally, because the PADD Act is remedial and protective in nature, a restrictive construction of the statute would disable DRMS from carrying out its federal mandate and frustrate its very mission. In sum, DRMS's reliance on regulations that have been upheld repeatedly by courts across the country is neither overreaching nor misplaced. These regulations reflect the clear, plain meaning of the PADD Act and ensure that DRMS can fulfill its congressionally mandated role to protect

---

[15] *Disability Rights Ohio v. Buckeye Ranch, Inc.*, 375 F. Supp. 3d 893 (S.D. Ohio 2019).
[16] *See also*, *Conn. Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.* 464 F.3d at 242 (2d Cir. 2006), finding that the PADD act clearly grants broad access to investigate abuse and neglect and grants general access for monitoring purposes. The regulations are consistent with the statutory interpretations of the P&A broad access authority.

individuals with developmental disabilities from abuse and neglect.

### 2. *Stare Decisis*

The District's attempt to nullify stare decisis is unavailing. Contrary to the District's position, stare decisis remains an essential and binding principle, especially where multiple courts have consistently upheld the broad authority of P&A systems under the PADD Act and other various companion statutes, therefore recognizing a stable body of law that should not be disturbed absent compelling justification. Further, the District mischaracterizes both the holding of *Loper Bright* and the principle of stare decisis as it relates to DRMS's statutory and regulatory authority under the PADD Act. The District's assertion that there should be no judicial deference to the regulations ignores the core inquiry established by *Loper Bright*, that courts must apply its own independent judgment to determine the best reading of the statute. Courts have routinely held that the P&A's have the authority to access individuals with disabilities, to monitor and investigate, and to access records necessary to investigate suspected incidents of abuse or neglect. Accordingly, the weight of judicial authority remains firmly in DRMS's favor, and *Loper Bright* offers no basis to disregard the body of case law affirming the legitimacy of DRMS's access rights under the PADD Act. DRMS's access claims are therefore well-grounded and DRMS is entitled to a Preliminary Injunction.

**B. <u>DRMS HAS MET ITS BURDEN FOR INJUNCTIVE RELIEF.</u>**

DRMS has met the legal standard for a preliminary injunction by clearly demonstrating all four required factors: (1) a strong likelihood of success on the merits, (2) the presence of irreparable harm, (3) that the balance of equities tips in its favor, and (4) that an injunction serves the public interest. The District's ongoing refusal to comply with federal law has impeded DRMS's ability to fulfill its congressionally mandated investigative authority under the PADD Act, and continues to expose vulnerable students to the risk of ongoing harm. As such, immediate injunctive relief is both necessary and appropriate.

*1. DRMS has demonstrated a Substantial Likelihood of Success on the Merits.*

DRMS is likely to prevail on the merits of its claim because the PADD Act clearly authorizes the access it seeks. In evaluating likelihood of success, courts require "evidence sufficient to support a prima facie case," though the evidentiary standard is not as demanding as that required for summary judgment. *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 776 (S.D. Miss. 2011). Courts assess this factor by applying the "standards of the substantive law." *Id.* The PADD Act unambiguously grants DRMS the authority to access records and facilities when it has probable cause to investigate allegations of abuse or neglect. 42 U.S.C. § 15043(a)(2)(B). It also grants authority to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for . . . such individuals." 42 U.S.C. § 15043(a)(2)(A)(i).

Once DRMS determines there is probable cause as the "final arbiter" of probable cause,[17] it is entitled to timely access the relevant records and individuals per the P&A Acts. 42 U.S.C. § 15043; 42 U.S.C. § 10806. Courts consistently uphold P&A agencies' access rights. See *Miss. Prot. & Advocacy Sys., Inc. v. Cotten*, 929 F.2d 1054 (5th Cir. 1991). As a result of DRMS determining probable cause of abuse and neglect, it triggered DRMS' access authority under federal law. 42 U.S.C. § 15043(a)(2)(B). Under the PADD Act, DRMS is authorized to investigate incidents of abuse or neglect involving individuals with developmental disabilities. *Id.*, 45 C.F.R. § 1326.27(b). In addition, the PADD Act explicitly grants DRMS broad access to the requested records and facility. 42 U.S.C. § 15043(a)(2)(I), (H). The District's intentional refusal constitutes a direct and explicit violation of federal law. Once DRMS determined probable cause to suspect abuse and neglect, it was entitled to access the records within three days. *Id.* at (a)(2)(J)(i); The District's refusal to comply with DRMS's access requests is a clear violation of DRMS's federal authority. Because the PADD Act and its implementing regulations support DRMS's position, DRMS has demonstrated a substantial likelihood of success on the merits.

---

[17] See also *Ariz. Ctr. for Disability Law vs. Allen,* 197 F.R.D. 689, 693 (D. Ariz. 2000)) (holding that Defendants may not deny access to records on the basis that they disagree with probable cause determination).

   2. ***DRMS will Face a Substantial Threat of Imminent and Irreparable Harm if the Preliminary Injunction is Not Granted.***

Irreparable harm exists where an injury cannot be adequately remedied by monetary damages. *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). DRMS faces ongoing and irreparable harm due to the District's continued denial of access to facilities and records. This obstruction impedes DRMS's ability to investigate abuse and neglect, directly undermining its federal mandate. As in *Ohio Legal Rights Serv. v. Buckeye Ranch, Inc.*, 365 F. Supp. 2d 877, 883 (S.D. Ohio 2005), such interference with a P&A's statutory duties constitutes irreparable harm. Moreover, each day of delay increases the risk that evidence will be lost and students subjected to continued mistreatment. Courts routinely hold that interference with a P&A's federal mandate constitutes irreparable harm because it thwarts protection of vulnerable individuals' civil rights. *See, e.g., Advocacy Inc. v. Tarrant Cnty. Hosp. Dist.*, 2001 WL 1297688, at*6 (N.D. Tex. Oct. 11, 2001) (finding irreparable harm due to inability to investigate allegations promptly). Courts have also routinely held that a P&A will be irreparably harmed if it is "prevented from pursuing fully its right to access records … in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring." *Prot. & Advocacy For Persons With Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 311 (D. Conn. 2003).[18]

Injunctive relief is necessary to prevent further irreparable harm to both DRMS and the students it serves. DRMS' inability to obtain critical information regarding abuse directly threatens student safety and well-being, causing irreparable physical and emotional harm that cannot be compensated by monetary damages. Absent immediate injunctive relief, DRMS will continue to suffer irreparable harm, and the individuals it is charged with protecting will remain vulnerable to the very dangers Congress tasked DRMS to prevent. This risk, paired with the District's ongoing

---

[18] Citing *Iowa Prot. & Advocacy Services, Inc. v. Rasmussen,* 206 F.R.D. 630, 635 (S.D. Iowa 2001) (quoting *Gerard Treatment Programs, L.L.C.,* 152 F.Supp.2d at 1173); *see also Wis. Coal. for Advocacy, Inc. v. Czaplewski,* 131 F.Supp.2d 1039, 1051 (E.D. Wis.2001); *Advocacy Ctr. v. Stalder,* 128 F.Supp.2d 358 (M.D. La.1999).

noncompliance, strongly favors injunctive relief.

   3. ***The Threat of Harm to the District in its Refusal to Comply Does Not Outweigh the Threatened Harm to DRMS.***

The balance of equities weighs decisively in DRMS's favor. The District will not suffer any substantial harm from compliance with the law. In fact, allowing DRMS to carry out its statutory obligations serves the mutual interest of both parties in protecting vulnerable students. A state agency cannot claim an interest in avoiding investigations of abuse or neglect regarding individuals with disabilities. *Ala. Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 499 (11th Cir. 1996). In fact, permitting DRMS to fulfill its statutory mandate would greatly benefit the District by enabling all parties to work together for the benefit of all students. Because the PADD Act ensures confidentiality protections are maintained, the District will not be harmed by providing DRMS access to confidential records. *See* 42 U.S.C. § 10806; 45 C.F.R. § 1326.28. The P&A Acts require DRMS to maintain their confidentiality to the same extent as The District. *See Id.* at 10806(a).

The administrative burden of producing existing records is minimal compared to the ongoing danger posed by noncompliance. The Sixth Circuit has described the balance of equities prong as "whether issuance of a preliminary injunction would cause substantial harm to others." *Disability Rights Ohio v. Buckeye Ranch, Inc.*, 375 F. Supp. 3d 873, 897 (S.D. Ohio 2019). The issuance of an injunction against the District will not subject it to harm but the refusal to provide access to records and facility for investigatory purposes poses a threat to DRMS's ability to discharge its statutory obligations. *Id.*

The District's deliberate obstruction places vulnerable students at ongoing risk of harm, while DRMS merely seeks to enforce its rights under clearly established federal law. Such compliance poses little to no hardship for the District, therefore, the equities weigh decisively in DRMS's favor. Accordingly, DRMS is entitled to a Preliminary Injunction.

   4. ***The Public Interest Would be Thoroughly Disserved by*** **the Court's Denial of DRMS's Motion for a Preliminary Injunction.**

The public interest is always served by requiring parties to comply with federal statutes. *See, e.g.*, *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 625 (5th Cir. 1985). The public has a vital interest in ensuring that agencies like DRMS can investigate and intervene when students with disabilities are at risk. DRMS's role is central to upholding civil rights, dignity, and educational equity for individuals with developmental disabilities. *See* 42 U.S.C. §§ 15043, 10805. Denying DRMS access to and records from the District thwarts the aforementioned goals and leaves vulnerable youth unprotected and abusers without oversight. Immediate injunctive relief affirms enforcement of critical federal protections, holding institutions accountable, deterring further misconduct, and safeguarding vulnerable individuals. *See Robbins v. Budke,* 739 F. Supp. 1479 (D.N.M. 1990) (recognizing significant public interest in protecting rights of disabled persons).

The District's refusal to provide access to records and facilities has ultimately obstructed DRMS's ability to investigate suspected abuse and neglect—the very harm the P&A was enacted to prevent. By granting the motion for preliminary injunction, the Court would reinforce the essential oversight role Congress envisioned and ensure the continued protection of Mississippi's most vulnerable population. Courts in the Fifth Circuit have noted that "[t]he general flexibility of equitable powers is enhanced where, as here, the public interest is at stake." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 562 (5th Cir. 1987). The public interest will be best served by granting DRMS injunctive relief in order that it may conduct a lawful investigation in accordance with federal law.

### III.    CONCLUSION

For the foregoing reasons, DRMS respectfully requests that the Court grant its Motion for Preliminary Injunction and immediately order the District to comply with federal law.

**WHEREFORE, PREMISES CONSIDERED, DISABILITY RIGHTS MISSISSIPPI** respectfully requests that its motion for Preliminary Injunction be granted.

**RESPECTFULLY SUBMITTED,** this the 30th day of July, 2025.

                                        **DISABILITY RIGHTS MISSISSIPPI**

                                        *D. Hunter V. Robertson*
                                        D. Hunter V. Robertson, MSB #105983
                                        DISABILITY RIGHTS MISSISSIPPI
                                        5 OLD RIVER PLACE, SUITE 101
                                        JACKSON, MISSISSIPPI 39202
                                        Office: (601) 968-0600
                                        Facsimile: (601) 968-0665
                                        Email: hrobertson@drms.ms
                                        ATTORNEY FOR THE PLAINTIFF

**CERTIFICATE OF SERVICE**

I, undersigned counsel of record, do hereby certify that a true and correct copy of the foregoing has been filed with this Court's electronic filing system which automatically send notification to all attorneys of record.

Dated: July 30, 2025

<i>D. Hunter V. Robertson</i>
D. HUNTER V. ROBERTSON, MSB #105983